**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:10-cr-00525-GMN-PAL |
| Plaintiff, | ) | |
| | ) | **REPORT OF FINDINGS AND** |
| vs. | ) | **RECOMMENDATION** |
| | ) | |
| FRANK PHILIP GOLDSTEIN, | ) | (Mtn to Suppress - Dkt. #123) |
| | ) | |
| Defendant. | ) | |

The court held an evidentiary hearing on Defendant Frank Philip Goldstein's Supplement to Defendant's Pro Per Motion to Suppress Statement Obtained in Violation of the Fifth Amendment (Dkt. #123) on October 16, 2012. Philip H. Brown appeared on behalf of Mr. Goldstein, and Nicholas Dickenson and Andrew Duncan appeared on behalf of the government. The court has considered the Supplement, the government's Response (Dkt. #128), Goldstein's Reply (Dkt. #130), the testimony adduced at the evidentiary hearing, and the arguments of counsel made at the hearing. After the hearing, defense counsel requested and received leave to file a supplemental reply based on the testimony adduced at the hearing. The court gave counsel until Friday, October 19, 2012, to file any supplemental papers, and allowed the government three days thereafter in which to file any supplemental response, indicating one was not required. The court has considered Defendant's Supplemental Reply (Dkt. #135). The government did not file a supplemental response.

## BACKGROUND

The grand jury returned an Indictment (Dkt. #1) against Goldstein on October 20, 2010, charging him with Carjacking, in violation 18 U.S.C. § 2119; two counts of Use of a Firearm During and in Relation to a Crime of Violence, in violation o f 18 U.S.C. § 924(c)(1)(A)(i) and (ii); and Interference with Commerce by Armed Robbery, in violation of 18 U.S.C. § 1951. The Indictment also contains forfeiture allegations. Defendant made his initial appearance on October 25, 2010, and Mr.

1    Michael Sanft was appointed to represent Goldstein.  *See* Minutes of Proceedings (Dkt. #7).  On May 2,

2    2011, the district judge appointed new counsel, Mr. Daniel Albregts, to represent Goldstein.  *See*

3    Minutes of Proceedings (Dkt. #31).  In an Order (Dkt. #42) entered October 11, 2011, the district judge

4    granted Goldstein's Motion to Continue Trial to Allow the Defense to Explore Competency Issues

5    (Dkt. #41).  October 17, 2011, Mr. Albregts moved to withdraw as counsel.  *See* Motion to Withdraw

6    (Dkt. #44).  The undersigned held a hearing on the Motion to Withdraw on November 8, 2011.  Mr.

7    Goldstein indicated he wanted to represent himself.  The court conducted a *Faretta* canvas, granted Mr.

8    Albregts' request to withdraw, and allowed Goldstein to appear pro se, with Mr. Albregts remaining as

9    standby counsel.  *See* Minutes of Proceedings (Dkt. #47).

10        On January 27, 2012, Goldstein filed a Motion for Evidentiary Hearing (Dkt. #57) pro se,

11   seeking to suppress certain statements he made to law enforcement officers.  At a hearing on February

12   21, 2012, Goldstein requested additional time to file a reply to the Motion for Evidentiary Hearing and

13   was granted a three-week extension.  *See* Minutes of Proceedings (Dkt. #64).  Goldstein replied on

14   March 1, 2012.  *See* Reply (Dkt. #69).  On March 5, 2012, the court held a status hearing with Mr.

15   Goldstein and Mr. Albregts without government counsel to address defense issues  *See* Minutes of

16   Proceedings (Dkt. #70).  Mr. Goldstein wanted to argue the merits of his Motion, but the court

17   indicated it was inappropriate to hear argument without government counsel being present and advised

18   that a written decision and order would be entered after the court reviewed Goldstein's reply.  The court

19   took the matter under submission.

20        On May 4, 2012, the court entered a Report of Findings and Recommendation (the "R&R")

21   (Dkt. #76), recommending the district judge deny Goldstein's requests (a) for an evidentiary hearing;

22   and (b) to suppress statements he made to law enforcement officers at the time of his arrest.  The court

23   found that Goldstein had not offered evidence of physical or psychological coercion or improper

24   inducements by the Las Vegas Metropolitan Police Department ("LVMPD") officers who elicited

25   statements from him.  The court observed that without evidence of coercion, Goldstein's personal

26   characteristics–i.e., his frame of mind and physical injury–are constitutionally irrelevant, and his

27   conclusory statements that he was under duress and distress because of his gunshot wound are

28   insufficient. Additionally, Goldstein did not claim he was questioned or interrogated after he invoked

2

1   his right to counsel.  Goldstein filed a sealed Objection (Dkt. #85) to the R&R on June 7, 2012, and the

2   government filed a sealed Response (Dkt. #90) on June 21, 2012.  The district judge entered an Order

3   (Dkt. #104) accepting the undersigned's R&R on June 29, 2012.  The district judge's Order noted that

4   Goldstein's Objection to the R&R relied on evidence and allegations that were not previously submitted

5   or available to the undersigned–namely, a newly-produced psychiatric evaluation of Goldstein.  The

6   district judge therefore allowed Goldstein to file an additional motion to suppress based on the new

7   evidence and allegations.

8        In the meantime, Goldstein was evaluated by Dr. Kahmien A. LaRusch, a board certified

9   psychiatrist, at the Nevada Southern Detention Center in Pahrump, Nevada, regarding Goldstein's

10   competency to stand trial.  Dr. LaRusch provided a Forensic Psychiatric Evaluation on May 14, 2012.

11       On July 19, 2012, the district judge held a hearing and appointed attorney Philip Brown as

12   counsel for Goldstein at Goldstein's request.  *See* Minutes of Proceeding (Dkt. #110); Order Appointing

13   Counsel (Dkt. #111).  The instant Supplement to Goldstein's Pro Per Motion to Suppress followed.

14                                   **DISCUSSION**

15   **I.    Evidence Before the Court.**

16        **A.    Testimony at Evidentiary Hearing.**

17        At the evidentiary hearing, the government called LVMPD Officer Alan Dong and City of

18   Henderson Firefighter/Paramedic, Robert Pettingill.  The court admitted government's Exhibits 1 and 2,

19   a transcript of Defendant's October 5, 2010 statement, and a DVD recording of the statement.  The

20   court also admitted Defendant's Exhibits A and B, photos of Defendant's gunshot wounds.  The

21   Defendant did not call any witnesses at the hearing.  The court canvassed Mr. Goldstein about his right

22   to testify.  Mr. Goldstein indicated that he was very satisfied with the representation of his counsel, Mr.

23   Brown.  Mr. Goldstein also acknowledged that he conferred with Mr. Brown who had advised him of

24   his right to testify and had made the decision of his own free will not to testify.

25        **B.    The Parties' Positions.**

26        First, Goldstein asserts that his statements should be suppressed because they were involuntary.

27   Relying on the Supreme Court's decision in *Mincey v. Arizona* and its progeny, Goldstein asserts that

28   because he was in pain, suffering from a gunshot wound, and receiving medical treatment when he

3

1  made inculpatory statements, the statements are not the product of a "free and rational choice."  437

2  U.S. 385, 399-402 (1978) (citing *Greenwald v. Wisconsin,* 390 U.S. 519, 521 (1968)).  In *Mincey*, the

3  defendant injured his hip in a shootout with police.  While receiving medical treatment in the hospital

4  several hours after being injured, he was mirandized and questioned by police.  The Court observed that

5  the defendant was "lying on his back on a hospital bed, encumbered by tubes, needles, and breathing

6  apparatus . . . [and was] at the complete mercy" of the detective who questioned him.  *Id.* at 397-98,

7  n.7.  As a result, the Court found defendant's statements and waiver were involuntary and not the

8  product of a "rational intellect and free will."  *Id.* at 398 n.7.  Goldstein contends that in his physical

9  condition, it is "unlikely" that he understood the significance of the *Miranda* warnings and the impact

10 of waiving his rights.  In addition, law enforcement questioned him within an hour of being shot.

11 Counsel maintains that Mr. Goldstein's statement in the ambulance while under paramedics' care was

12 involuntary because he was "lying helpless, unable to resist, and subject to care."  Motion at 10:17-20.

13         Second, Goldstein's argues his waiver of *Miranda* rights was not knowingly made because he

14 lacked capacity to understand the significance of the waiver.  Goldstein's "extreme emotional state and

15 diminished capacity" make it "unlikely" that his waiver was knowing and voluntary, especially

16 considered in light of his physical injuries and pain.  Motion at 11:19-22.  Dr. LaRusch's report

17 indicates that at the time of his arrest, Goldstein was suicidal, borderline insane, and lacked sufficient

18 capacity to "think soundly."  *See* Forensic Psychiatric Evaluation at 13, attached to Supplemental

19 Motion as Exhibit 1.

20         Third, Goldstein contends any statements made to the detectives at the hospital following

21 Goldstein's invocation of his right to counsel should be suppressed pursuant to the Supreme Court's

22 decision in *Edwards v. Arizona,* 415 U.S. 477 (1981).  In *Edwards,* the Supreme Court held that an

23 accused person in custody who has invoked his right to counsel cannot be further interrogated by law

24 enforcement until counsel is made available to him, or unless the accused himself initiates further

25 communication with law enforcement.  *Id.* at 484-85.  Because Detectives Martinez and Araujo

26 initiated contact with Goldstein and questioned him after invoking his right to counsel, any statement

27 Goldstein made to them should be suppressed.

28 / / /

1    In response, the government contends Goldstein has not provided any new information or legal
2    citation to show his statements were involuntary, and it incorporates the arguments from its Response to
3    Goldstein's original Motion to Suppress.  The government asserts suppression is not warranted because
4    Goldstein's post-*Miranda* statements were not the result of coercion by law enforcement.  The fact that
5    Goldstein was shot does not render his statements to the officers involuntary.  Relying on *Mincey*, the
6    government maintains Goldstein's mental and physical state was not serious enough to render his
7    statements involuntary.  The government alleges that after Goldstein was shot, he could still drive and
8    led police on a high speed chase.  He waived his *Miranda* rights, spoke freely with Officer Dong,
9    understood the questions the officer asked, and responded coherently. He admitted to lying, expressed
10   remorse, and invoked his right to counsel.  Additionally, Goldstein's claim that his statements could be
11   misunderstood is irrelevant in light of the Supreme Court's decisions in *Rogers v. Richmond*, 365 U.S.
12   534, 543-44 (1961), and *Lego v. Twomey*, 404 U.S. 477, 485 n.4 (1972), where the Court found that the
13   truth or falsity of a confession is irrelevant to the issue of admissibility, and the sole issue regarding a
14   confession's admissibility is whether a confession is coerced.  The government maintains Goldstein can
15   explain his statements if he chooses to testify or by cross-examining Officer Dong.  Additionally,
16   relying on *Cox v. Del Papa,* the government maintains that *Miranda* does not apply to the spontaneous
17   statements Goldstein made to officers responding to the scene.  542 F.3d 669, 676 n.10 (9th Cir. 2008).

18   The government also asserts that Goldstein knowingly and voluntarily waived his *Miranda*
19   rights.  It notes that Goldstein does not dispute LVMPD officers gave him *Miranda* warnings.  This,
20   coupled with the court's prior finding that Goldstein's statements were voluntary and not the result of
21   coercion by law enforcement, renders Goldstein's *Miranda* waiver voluntary as well.  Goldstein has not
22   claimed the police were coercive, and Goldstein was not subjected to an overly long interrogation or
23   questionable interview techniques.  Goldstein's assertion that his *Miranda* waiver was "unlikely"
24   knowingly and intelligently made is insufficient to show it is inadmissible.

25   The government compares this case to *United States v. George,* where the defendant was
26   hospitalized after suffering a drug overdose.  987 F.2d 1428, 1430-31 (9th Cir. 1993).  In that case, the
27   defendant's condition did not stabilize until four hours after officers questioned him.  However, the
28   Ninth Circuit still found his *Miranda* waiver was knowingly and intelligently made because the

5

defendant was coherent, gave responsive answers to officers' questions, and accurately remembered details. *Id.* at 1431. Like the defendant in *George*, Goldstein accurately recounted details and gave responsive and coherent answers to officers. The government asserts that Goldstein understood his rights because he ultimately invoked his right to counsel. Additionally, Dr. LaRusch's report indicates that Goldstein did not suffer from delusions, hallucinations, disorganized speech, or bizarre or catatonic behavior. Dr. LaRusch's findings were based on the fact that Goldstein was going through painkiller withdrawal. The Ninth Circuit found that people going through withdrawal can knowingly and intelligently waive their *Miranda* rights in *United States v. Rodriguez,* 364 F.3d 1142, 1146 (9th Cir. 2004), *amended by* 393 F.3d 849 (9th Cir. 2005). Finally, the government represents that it will not seek to admit any statements Goldstein made after he invoked his right to counsel.

Goldstein replies that testimony adduced at an evidentiary hearing will show he did not voluntarily waive his *Miranda* rights. However, if the court "has any doubt about the involuntary nature" of Goldstein's statements, he requests leave to file supplemental briefing at the conclusion of the hearing.

## II.    Goldstein's Request for an Evidentiary Hearing.

Goldstein requested an evidentiary hearing pursuant to the Supreme Court's decision in *Jackson v. Denno*, 378 U.S. 368, 376 (1964). In *Jackson,* the Supreme Court found that a criminal defendant has a constitutional right to object to the use of a confession and have a "fair hearing and reliable determination of voluntariness." *Id.* (citing *Rogers v. Richmond*, 365 U.S. 534 (1960)). Additionally, whether a confession is voluntary should be determined in a separate proceeding from the trial. *Id.* at 394; *see also United States v. Batiste,* 868 F.2d 1089, 1092 n.5 (9th Cir. 1989) (characterizing the entitlement to a hearing recognized in *Jackson* as an automatic constitutional right to an evidentiary hearing). The Supreme Court later clarified its holding in *Jackson* in *Wainright v. Sykes,* 433 U.S. 72, 86, *rehearing denied,* 434 U.S. 880 (1977). It stated that the Constitution only requires a voluntariness hearing where a defendant makes a contemporaneous challenge to the use of a confession. 433 U.S. at 86.

/ / /

/ / /

6

1    The court granted Goldstein's request for an evidentiary hearing because he supported the

2    motion with Dr. LaRusch's report and claimed that he was questioned after he invoked his right to

3    counsel.

4    **III.**    **Applicable Law & Analysis.**

5    A voluntary statement is "one that is the product of a rational intellect and free will." *United*

6    *States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992), *overruled on other grounds by United States v.*

7    *Dearing,* 9 F.3d 1428 (9th Cir. 1993), (citing *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)).  The

8    government bears burden of proving a confession is voluntary by a preponderance of the evidence.

9    *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir.

10    1991) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).  "In evaluating voluntariness, the 'test is

11    whether, considering the totality of the circumstances, the government obtained the statement by

12    physical or psychological coercion or by improper inducement so that the suspect's will was

13    overborne." *United States v. Male Juvenile,* 280 F.3d 1008, 1022 (9th Cir. 2002) (citing *Derrick,* 924

14    F.2d at 817); *see also Dickerson v. United States,* 530 U.S. 428, 434 (2000).

15    Coercive police activity is a necessary predicate to a finding that a confession is not voluntary.

16    *Id.* at 167; *Kelley,* 953 F.3d at 565 (citing *Connelly* for examples of police overreaching, including

17    lengthy questioning, deprivation of food or sleep, physical threats of harm, and forms of psychological

18    persuasion).  The personal characteristics of the accused are "constitutionally irrelevant absent proof of

19    [police] coercion." *Derrick*, 924 F.2d at 818 (quoting *United States v. Rohrbach*, 813 F.2d 142, 144

20    (8th Cir. 1987) (citations omitted)).  There must also be some causal connection between the police

21    conduct and the confession. *Kelley,* 953 F.3d at 565 (citing *Connelly*, 479 U.S. at 164). In *Connolly,*

22    the Supreme Court recognized  that "as interrogators have turned to more subtle forms of psychological

23    persuasion, courts have found the mental condition of the defendant a more significant factor in the

24    'voluntariness' calculus." *Connolly,* 479 U.S. at 164 (citing *Spano v. New York*, 360 U.S. 315 (1959))

25    (finding because there was no coercion by law enforcement, defendant's confession was voluntary

26    despite his mental psychosis that interfered with free will); *see also Cunningham v. City of Wenatchee*,

27    345 F.3d 802, 810-11 (court found no police coercion and voluntary confession despite defendant's

28    / / /

7

1  bipolar disorder, duration of interrogation being eight hours, and officer's denial of defendant's request

2  to call therapist).

3       However, a statement "may not be admitted if because of mental illness, drugs, or intoxication,

4  the statement was not the product of a rational intellect." *Kelly,* 953 F.2d at 566 (citing *Gladden v.*

5  *Unsworth,* 396 F.2d 373, 380-81 (9th Cir. 1968)) (confession voluntary despite defendant suffering

6  heroin withdrawal, shaking and trembling, and telling agents they needed to hurry if they wanted to

7  continue the interrogation); *see also United States v. Heller,* 551 F.3d 1108 (9th Cir. 2009) (confession

8  voluntary despite defendant's ingesting Tylenol III before arriving at the police station); *United States v.*

9  *Rodriguez-Rodriguez,* 364 F.3d 1142, 1146 (9th Cir. 2004), *amended on other grounds by* 393 F.3d 849

10 (9th Cir. 2005) (confession voluntary despite defendant's heroin withdrawal because defendant was

11 alert, coherent, and oriented); *United States v. Coleman,* 208 F.3d 786, 791 (same); *Medeiros v.*

12 *Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (confession voluntary because defendant's intoxication did

13 not overcome his free will; defendant was able to drive, obey officers' instructions, and was cooperative

14 in talking with them); *United States v. Martin,* 781 F.2d 671, 674 (9th Cir. 1985) (type, dosage, and

15 schedule of painkilling narcotic administered to defendant was insufficient to overbear defendant's will

16 to resist questioning or impair his rational faculties).

17       On the other hand, in *Mincey v. Arizona,* 437 U.S. 385, 398–99 (1978), the Supreme Court

18 found that a statement obtained from a defendant who was in the hospital, in a near-comatose condition,

19 suffering great pain, while fastened to tubes, needles, and a breathing apparatus, was coerced and

20 therefore involuntary.  Similarly, in *Haynes v. State of Washington,* 373 U.S. 503, 511–12 (1963), the

21 Court invalidated a confession where the suspect was held by law enforcement for over five days and

22 never advised of his rights.  *Id.*  The Court has also found that where police questioned a suspect for

23 thirty-six hours straight, the suspect's confession was coerced and involuntary.  *See Ashcraft v.*

24 *Tennessee,* 322 U.S. 143, 149–54 (1944).  Likewise, in *Henry v. Kernan,* 197 F.3d 1021, 1028 (9th

25 Cir.1999), the Ninth Circuit determined defendant's confession was involuntary because detectives

26 admitted to continuing their interrogation after the defendant had unambiguously invoked his *Miranda*

27 rights.  *Id.; see also California Attorneys for Criminal Justice v. Butts,* 195 F.3d 1039, 1046 (9th

28 Cir.1999) (same).

8

1      Here, Officer Dong testified that he has been an LVMPD Officer for eighteen years and was

2  assigned to patrol the Southwest Central Command on October 5, 2010.  He received a call at

3  approximately 1:30 p.m. or 1:40 p.m. of a robbery at the Victory Pharmacy at Flamingo and Eastern,

4  and that officers were pursing the suspect vehicle, a maroon GMC Yukon.  He responded to the call,

5  and five to ten minutes later, observed the suspect vehicle eastbound on I-215 with numerous patrol

6  vehicles in pursuit.  The driver of the Yukon failed to negotiate a left-hand turn and crashed into a

7  power box at a Target shopping center in Henderson, Nevada.  Officer Dong approached the vehicle

8  after it crashed into the power box and immediately removed the driver and placed him in handcuffs.

9  Officer Dong identified the Defendant as the driver of the Yukon he removed and placed in cuffs.

10      Officer Dong testified that he called for medical assistance because Goldstein was involved in

11  an accident, and he noticed blood on Goldstein's pant leg near the buttocks area.  While waiting for

12  medical personnel to respond, Goldstein was crying and stating he was sorry and that he did a stupid

13  thing.  Goldstein asked to call his wife and was very apologetic.  Officer Dong observed a holster on the

14  ground and asked Goldstein where the gun was.  Goldstein responded that it was in a safe place.

15  Officer Dong removed Goldstein from the vehicle and walked him to a nearby bench and sat him there.

16  While seated on the bench, Goldstein kept apologizing and stating he was sorry and that he wanted to

17  call his wife.  A sergeant on the scene instructed Officer Dong to take Goldstein off the bench and sit

18  him on the curb.  Another officer at the scene, Officer Baldasari [phonetic] came over and read

19  Goldstein his rights from a printed *Miranda* card.  The card was a standard LVMPD-issued card.

20  Officer Dong heard the second officer administer Goldstein his *Miranda* warnings.  Goldstein was

21  asked whether he understood his rights and responded "yes."  Officer Dong continued conversing with

22  Goldstein and told him to relax and breathe because the officer believed Goldstein had been shot.

23  Officer Dong testified that Goldstein was very defensive and insisted he had not been shot.  Goldstein

24  appeared not to believe he had been shot and acted as if Dong was trying to trick him.  Dong told

25  Goldstein that he was bleeding from the buttocks area.

26      After *Miranda* warnings were administered, Dong asked Goldstein whether the gun was real.

27  Goldstein responded that it was not, and that he went into the pharmacy to get prescription drugs

28  / / /

1   because he was in pain.  Goldstein kept speaking, stating he did not want to hurt anyone and that he got

2   scared because an employee of the pharmacy came out with a gun.

3        A supervisor, Sergeant Shannon, located the gun at the scene.  Goldstein yelled out that he had

4   dropped the gun at the pharmacy.  Dong asked Goldstein why he did it.  Goldstein responded that he

5   needed pain medication because he was in a great deal of pain because of a broken back.

6        The paramedics arrived ten or fifteen minutes after the initial stop and attended to Goldstein's

7   wounds, started an IV, took blood pressure readings, monitored his heart, placed a C-collar on him, and

8   placed him on a backboard.  Officer Dong took the cuffs off Goldstein and re-cuffed his left wrist to the

9   backboard.  Dong then contacted Detective Araujo who gave Dong a recording device.  Goldstein was

10  placed in the ambulance, and Dong started recording the conversation with Goldstein.

11       A transcript of the conversation was admitted as Government's Exhibit 1, and a copy of the

12  recorded interview was admitted as Government's Exhibit 2.  The recording was played in court.

13  Officer Dong asked Goldstein about the carjacking and pharmacy incident and Goldstein made

14  incriminating statements.  Officer Dong asked Goldstein if he wanted a lawyer.  When Goldstein

15  responded affirmatively, Dong terminated the interview.

16       On cross examination, Dong testified that a number of officers pursued the suspect vehicle

17  before the Yukon crashed in the Target shopping center.  A number of officers arrived at the scene of

18  the crash almost simultaneously along with two sergeants.  Dong did not believe the officers were using

19  a PA system to communicate with the driver of the Yukon.  However, on cross examination he

20  acknowledged that another officer's report states that police used a PA system at the scene.  Officer

21  Wimmer [phonetic] was to Officer Dong's left and was giving the driver commands.  Dong did not

22  issue any verbal orders to the occupant of the Yukon because , based on his training and experience, it

23  is best for one officer to give commands because a suspect can become confused by multiple

24  commands.  Dong opened the driver's side of the Yukon, removed Goldstein, put him on his stomach

25  as trained and then placed him in handcuffs.  He described Goldstein as elderly and bleeding.  He had a

26  conversation with Goldstein after Goldstein was taken out of the vehicle and before the second officer

27  administered *Miranda* warnings.  He estimated his conversation took five to eight minutes.  Officer

28  Dong reiterated that Goldstein was defensive, "like he didn't believe me when I told him he'd been

shot." Goldstein was crying and emotional when he was removed from the vehicle. Goldstein did not sign a written waiver of *Miranda* warnings. Goldstein did not appear confused. He was alert, oriented, and his answers to questions were responsive.

In the ambulance, Dong asked Goldstein about his "DL" (driver's license). Goldstein responded that he did not know what a "VL" was. Dong clarified he was asking about Goldstein's driver's license. Goldstein knew what a driver's license was but did not understand the abbreviation Dong used. Goldstein was moaning. Dong directed Goldstein to concentrate. He usually advises subjects to concentrate before interviewing them. Dong did not re-advise Goldstein of his *Miranda* rights while in the ambulance. While en route to the hospital, the EMTs monitored Goldstein's vital signs, but did not do "anything intrusive." The EMTs recorded readings taken "in the field" before Goldstein was placed in the ambulance. EMTs did not treat or attend to Goldstein while Dong took his tape recorded statement.

Dong met Detective Araujo at the hospital and briefed him on what had occurred in the ambulance. He advised Detective Araujo that Goldstein invoked his right to counsel. Dong did not know whether Detective Araujo went to the hospital to interview Goldstein after being told Goldstein had invoked his right to counsel.

Henderson Firefighter and Paramedic Robert Pettingill also testified at the evidentiary hearing. He testified that he was on duty on October 5, 2010, when he received a call around 2:00 p.m. of a person with a gunshot wound to the leg. He arrived at the scene a few minutes later and observed Goldstein with a wound to the right thigh and buttock area. Goldstein was breathing fine and was in stable condition, and Pettingill did an immediate assessment of Goldstein's mental status. Standard operating procedure is to ask a person who they are, the city in which they are located, whether they know the month, day and year, and who the president is. Goldstein was able to answer all of these questions and was coherent and alert. He scored fifteen out of a possible score of fifteen on the assessment of mental status. His blood pressure was 140/90. A heart monitor was applied, and Goldstein had an elevated heart rate of 120. His pulse oxygen level and blood sugar levels were normal.

/ / /

1    Pettingill performed three separate sets of tests, and Goldstein's heart rate came down as he

2    approached the hospital.  Goldstein scored a fifteen out of a possible fifteen on all three sets of mental

3    status exams Pettingill conducted.  Goldstein was hooked up to an IV en route to the hospital.

4    Establishing an IV is standard procedure in emergencies of this nature in case surgery is needed or

5    medications are needed to be administered through IV.  Goldstein was taken to Sunrise Hospital and

6    turned over to hospital staff.

7    On cross examination, Pettingill acknowledged that he believed that Goldstein had been shot in

8    the leg or buttock area.  He was shown photographs by counsel for Defendant and acknowledged that

9    the photographs showed a wound to the back as well as a wound to the upper leg area near the buttock.

10    Pettingill checked Goldstein's glucose levels because Goldstein indicated he was diabetic.  The glucose

11    level was 243 which is high.  A low glucose level of 60 can cause altered mental status.  Pettingill did

12    not specifically recall asking Goldstein about the medications he was taking.  He was shown his report

13    to refresh his recollection.  Pettingill testified that he did not recall asking Goldstein why he was taking

14    methadone.  Goldstein indicated he was taking medications for diabetes and hypertension.  Based on his

15    training and experience, Pettingill knows that methadone is sometimes taken for pain or to get off

16    heroin.  Pettingill did not recall if Goldstein said he was addicted to pain medications.  He would

17    characterize methadone as a seven on a scale of one to ten in terms of potency.

18    Goldstein's post hearing Supplemental Reply (Dkt. #135) argues that Officer Dong's testimony

19    at the evidentiary hearing established that there was a back-and-forth conversation between the officer

20    and Mr. Goldstein five to eight minutes before *Miranda* warnings were given.  Officer Dong admitted

21    Goldstein was in custody.  Therefore, *Miranda* warnings were required.  Counsel for Goldstein

22    contended that Office Dong violated Goldstein's *Miranda* rights by directly questioning him in the five

23    to eight minutes before *Miranda* warnings were given.  Goldstein was in distress, crying, and bleeding

24    from a gunshot wound, in shock, and "so disoriented that he did not believe the officer when he was

25    informed that he had been shot."  Counsel contends that the exchange between Goldstein and Officer

26    Dong was not a "mere conversation" but question and answer exchanges.  This custodial interrogation

27    while Goldstein was in shock, bleeding and distraught renders Goldstein's statements involuntary, and

28    the testimony establishes that Goldstein did not voluntarily or knowingly waive his *Miranda* rights.

1     It is undisputed that Goldstein was taken into custody immediately after he crashed the Yukon

2   into the utility box.  Officer Dong removed him from the vehicle and immediately placed him in

3   handcuffs.  Counsel for the government conceded at the evidentiary hearing that Goldstein was in

4   custody at this point for the purposes of the requirement to administer *Miranda* warnings.  It is also

5   undisputed that Goldstein was crying, emotional, and bleeding from a gunshot wound.  Officer Dong

6   called for medical assistance because of the crash and because he observed blood on Goldstein's pant

7   leg in the buttocks area.  It is uncontroverted that *Miranda* warnings were administered by the second

8   officer in Officer Dong's presence from a standard LVMPD issued card.  Finally, it is undisputed that

9   Goldstein and Officer Dong "conversed" for five to eight minutes before *Miranda* warnings were given.

10   Goldstein characterizes the conversation during the five to eight minutes as custodial interrogation.  The

11   government claims Goldstein made spontaneous statements for which *Miranda* warnings were not

12   required.

13     The court heard the testimony and carefully listened to the audio recording of the hearing to

14   decide whether Dong engaged in custodial interrogation before Miranda warnings were given.  The

15   court finds he did.  Officer Dong testified that he asked Goldstein where the gun was after observing the

16   holster.  Asking Goldstein where the gun was after observing the holster was objectively reasonable for

17   officer and public safety reasons.  Goldstein's only response was that the gun was in a "safe place."

18   *Miranda* does not apply to spontaneous statements a person makes which are not the result of custodial

19   interrogation or its functional equivalent.  *Cox v. Del Papa*, 452 F.3d 669, 676 n.10 (9th Cir. 2008).

20   Officer Dong testified that Goldstein was crying, apologetic, and wanted to call his wife.  Officer Dong

21   testified that these were spontaneous statements that Goldstein made and not in response to any

22   questions he asked.  The court found Officer Dong's testimony credible in this regard, and his

23   testimony was not impeached on cross examination.

24     However, Dong testified on cross examination and on redirect examination that before *Miranda*

25   warnings were given, he asked Goldstein questions about what he did that morning, how he got the car,

26   and "general questions about his well-being and what happened that morning."  Under the

27   circumstances, questions about Goldstein's well-being did not require *Miranda* warnings.  Questions

28   about what he did that morning, and how he got the carjacked vehicle, however, did.  The court finds

1    the government did not meet its burden of establishing that Goldstein's statements to Officer Dong

2    before *Miranda* warnings were given were all spontaneous or volunteered.  Officer Dong clearly

3    questioned Goldstein about the incidents he was suspected of involvement in, and Goldstein was in

4    custody before *Miranda* warnings were given.  The testimony glossed over which of Goldstein's

5    statements were spontaneous and which were in response to explicit questions.  The court therefore

6    finds that all of Goldstein's statements to Officer Dong prior to *Miranda* warnings should be

7    suppressed.

8          Goldstein also argues that his all of his statements were not the product of a rational intellect

9    and free will because of his physical and emotional state. The court disagrees.  Goldstein did not testify

10   or call Dr. LaRusch to testify.  However, in oral argument at the hearing, counsel for Goldstein argued

11   the court should consider Dr. LaRusch's Forensic Psychiatric Evaluation Report which is attached as an

12   exhibit to the Supplemental Motion to Suppress (Dkt. #123).  Dr. LaRusch did not examine Goldstein

13   at or near the date of his arrest.  He conducted a four hour and forty minute mental status examination

14   on April 18, 2012, nearly eighteen months after Goldstein's arrest.  Dr. LaRusch administered a number

15   of tests and diagnosed Goldstein on Axis I with opiate dependence and major depressive disorder,

16   recurrent, moderate.  He made no Axis II diagnosis and diagnosed Goldstein with chronic back pain,

17   secondary to herniated disk from injury as a teenager on Axis III.

18          Dr LaRusch opines that Goldstein suffered a temporary mental collapse under stress on the date

19   of the incidents which left Goldstein's "usual, logical, rational self paralyzed."  LaRusch Report at 11.

20   However, he also opines that Goldstein was not "quite sick enough to be diagnostically labeled as

21   psychotic or delusional at the time of the incident." *Id*.  Goldstein "wasn't thinking as he normally

22   would have, but, like a psychotic or delusional person, he behaved irresponsibly and irrationally." *Id*.

23   Dr. LaRusch concluded that Goldstein was not delusional and "would have been able to pass a reality

24   orientation test the date of the incident." *Id.* at 12.  Goldstein did not meet the diagnostic criteria for

25   brief psychotic disorder under DSM-IV-TR. *Id*.  He was not hallucinating. *Id*.  He did not have

26   disorganized speech. *Id*.  He did not have grossly disorganized, bizarre or catatonic behavior. *Id*.  Dr.

27   LaRusch concludes that Goldstein was "in a state of borderline insanity." *Id*.  Goldstein was not

28   thinking soundly on the date of the incident according to Dr. LaRusch and "temporarily had a

1   diminished capacity to think soundly." *Id*. at 13.  Dr. LaRusch concludes his report by opining that

2   Goldstein will not re-offend as long as he receives adequate medical treatment because he is not a

3   career criminal, "merely a man who 'snapped' under too much pressure." *Id*. at 14.

4        It is undisputed that post-*Miranda* questioning was done both at the scene of the arrest and in an

5   ambulance en route to the hospital. Goldstein had been shot and was bleeding.  However, both Officer

6   Dong and firefighter/paramedic Pettingill testified Goldstein was alert, oriented, and responsive to

7   questions.  Pettingill testified that Goldstein scored fifteen of a possible fifteen on three successive

8   mental status  evaluations.   The court found this testimony credible. The interview in the ambulance

9   was short.  Officer Dong estimated it lasted six minutes.  It was played in open court during the

10  evidentiary hearing.  Goldstein was obviously upset.  However, he was also oriented, coherent, and

11  responsive to questions.  Goldstein denied he had been shot, but told Dong he went to the pharmacy to

12  get pain medications, other than those that were prescribed to him so that "they wouldn't identify me."

13  Goldstein told Dong he was trying to get medications for in pain from a broken back he suffered as a

14  teenager and that he thought he had a cracked rib. When Officer Dong questioned Goldstein about

15  whether his wife was aware he was going to commit a robbery, Goldstein rationally responded that he

16  did not want to put his wife in any potential jeopardy, and that she begged him not to steal.  Officer

17  Dong asked whether Goldstein wanted a lawyer, construing his wish not to talk about his wife as an

18  indication Goldstein might not want to talk further.  Goldstein stated he wanted a lawyer, and the

19  interview was terminated with Dong telling Goldstein nothing Goldstein said from that point on could

20  be used against him.

21        Dr LaRusch did not observe or examine Goldstein on the day of his arrest and did not testify at

22  the evidentiary hearing.  One of the reasons Dr LaRusch cites for his opinions about Goldstein's mental

23  status on the date of his arrest is based on Goldstein's statement to Dr LaRusch that because of his

24  severe addiction Goldstein "thought he was 59 at the time of his arrest when actually he was 60."

25  LaRusch Report at 12.  However, in his tape recorded statement to Officer Dong, Goldstein correctly

26  stated he was sixty on the date of his arrest.  The court does not doubt that Goldstein was distraught,

27  crying, in some pain, and concerned about his wife after crashing the Yukon into a power box and being

28  removed from the vehicle at gunpoint and arrested.  He may also have been suffering symptoms of

withdrawal from pain medications.  The record is insufficient on this point to make a finding.
However, as the cases cited above make clear, statements taken while a person is withdrawing from
drugs are not involuntary for this reason alone.

The court finds that under the totality of the circumstances, Goldstein's post-*Miranda*
statements to  Officer Dong at the scene and in the ambulance en route to the hospital were voluntary.
Absent deliberately coercive or improper police tactics in obtaining an initial statement before *Miranda*
warnings, "there mere fact that a suspect has made an unwarned admission does not warrant a
presumption of compulsion" with respect to a post warning statement.  *Oregon v. Elstad*, 470 U.S. 298,
314 (1985); *see also United States v. Williams*, 435 F.3d 1148 (9th Cir. 2006). The statements were not
obtained by any physical or psychological coercion or improper inducements by Officer Dong.
Goldstein's rational intellect and free will were not overborne by any law enforcement conduct or
overreaching.  The court finds the government has met its burden of showing, by a preponderance of the
evidence, that Goldstein received and knowingly and intelligently waived his *Miranda* rights.  The
waiver was the result of  a free and deliberate choice and not the product of police intimidation,
coercion or deception. The court also finds that Goldstein had the cognitive capacity to understand and
waive his rights.

For these reasons,

**IT IS RECOMMENDED** Goldstein's Supplement to Defendant's Pro Per Motion to Suppress
Statements Obtained in Violation of the Fifth Amendment (Dkt. #123) be GRANTED IN PART and
DENIED IN PART.  Goldstein's pre-*Miranda* statements to Officer Dong should be suppressed.
Goldstein's post-*Miranda* statements to Officer should Dong should be admitted.

Dated this 29th day of October, 2012.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE