1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

9

10

11

12

13

14

United States of America,

                    Plaintiff

vs.

Frank Goldstein,

                    Defendants

Case No.: 2:10-cr-00525-JAD-PAL

**Order Approving Report of
Findings and Recommendation [Doc. 138] and
Granting in Part and Denying in Part
Defendant's Motion to Suppress Statements
Obtained in Violation of the Fifth
Amendment [Doc. 123]**

15

16

17

18

19

20

21

22

        Before the Court for consideration is the Report and Recommendation that United States

Magistrate Judge Peggy A. Leen entered on October 29, 2012.  Doc. 138.  Judge Leen recommends

that Defendant Frank Goldstein's Supplement to Defendant's Pro Per Motion to Suppress Statements

Obtained in Violation of the Fifth Amendment be granted in part and denied in part.  Doc. 123.

Defendant filed an Objection to the Report and Recommendation on November 13, 2012, Doc. 145,

to which the Government responded on November 13, 2012.  Doc. 151.  Defendant replied on

November 20, 2012.  Doc. 149.

23

24

25

26

        Goldstein is charged with carjacking a vehicle from a Bank of America drivethrough ATM,

with attempted robbery at Victory Pharmacy in Las Vegas, and with using a firearm in committing

each of these crimes.  Doc. 1, 1–3.  During a skirmish with the pharmacist, Goldstein was shot in the

buttocks area, but he fled and proceeded to lead the Las Vegas Metropolitan Police Department on a

1   high-speed chase.  Doc. 150 at 40–41.  He drove erratically, entered and exited the freeway twice, hit

2   a parked car, and a second collision stopped the vehicle altogether.  Doc. 122, 2; Doc. 127, 2–3.

3       Officer Alan Dong removed Goldstein from the vehicle, took him into custody, and called for

4   emergency medical services.  Doc. 150, 9–10.  Goldstein was screaming and apologetic: he said was

5   sorry for what he did, that it was a stupid thing to do, and that he wanted Officer Dong to call his

6   wife.  *Id.* at 11, 15.  The officer then noticed an empty gun holster on the ground and asked Goldstein

7   about the whereabouts of the gun.  *Id.* at 11.  The officer continued to ask Goldstein questions during

8   the approximately five to eight minutes between Goldstein's apprehension and the reading of his

9   *Miranda* rights by another officer, Officer Balsassare.  *Id.* at 37.  Goldstein indicated he understood

10  his *Miranda* rights and, after further questioning, said the gun was at the pharmacy.  *Id.* at 14–16.

11      Emergency medical responders then arrived, briefly treated Goldstein, and transferred him

12  into an ambulance for transport to the hospital.  *Id.* at 17–18.  Officer Dong rode in the ambulance

13  with Goldstein and made an audio recording of their conversation during which Goldstein responded

14  to Officer Dong's questions with inculpatory statements about the charged carjacking and robbery

15  attempt until Goldstein eventually said that he did not want to talk anymore.  Mot. Hr'g, Oct. 16,

16  2012, Gov't Ex. 1, Tr. of Oct. 5, 2010 Ambulance Statements (hereinafter "Ex. 1"); Mot. Hr'g, Oct.

17  16, 2012, Gov't Ex. 2, Audio Recording of Oct. 5, 2010 Ambulance Statements (hereinafter "Ex.

18  2").  Officer Dong then asked whether Goldstein wanted a lawyer, Goldstein responded that he did,

19  and the interrogation inside the ambulance ended.  *Id.*

20      Defendant's motion seeks to suppress statements he made to police during three intervals: (1)

21  those made between apprehension and the administration of *Miranda* warnings minutes later, (2)

22  those made between *Miranda* warnings and invocation of the right to counsel, and (3) those made

23  after invocation of the right to counsel.  Defendant contends that his pre-*Miranda* statements are

24  inadmissible because they were the result of custodial interrogation.  He challenges his post-*Miranda*

25  statements as inadmissible on the basis that he did not knowingly and voluntarily waive his rights

26

1   under *Miranda v. Arizona*, 384 U.S. 436 (1966), or *Mincey v. Arizona*, 437 U. S. 385 (1978).  And

2   he claims that the statements made at the hospital should be suppressed under *Edwards v. Arizona*,

3   451 U.S. 477 (1981), because he had invoked his right to counsel.  Finally, he claims that all of his

4   statements should be inadmissible because the police conduct was so outrageous that it shocks the

5   conscience as contemplated by *Rochin v. California*, 342 U.S. 165 (1952).

6       The issues were narrowed through extensive briefing, oral argument, and an evidentiary

7   hearing.  The Government agreed that Goldstein was in custody from the moment of his post-high-

8   speed-car-chase apprehension from the then-wrecked vehicle, Doc. 150 at 96, and it agreed that the

9   post-invocation-of-counsel statements will not be used.  Doc. 128 at 7, Doc. 150 at 85:5–18, Doc.

10  152 at 3 n.1.  Thus, at the time the Magistrate Judge issued her Report of Findings and

11  Recommendation, Doc. 138, the issues were: (1) the admissibility of the pre-*Miranda* statements, (2)

12  the voluntariness of the statements made after Mirandizing and before invocation of the right to

13  counsel, and (3) whether the police acted outrageously under *Rochin*.  The Magistrate Judge found

14  that all of Goldstein's pre-*Miranda* statements should be suppressed because "the government did

15  not meet its burden of establishing" a *Miranda* exception.  Doc. 138 at 14.  She found that "under the

16  totality of the circumstances, Goldstein's post-*Miranda* statements to Officer Dong at the scene and

17  in the ambulance en route to the hospital were voluntary" and, thus, the government "met its burden

18  of showing, by a preponderance of the evidence, that Goldstein received and knowingly and

19  intelligently waived his *Miranda* rights," and that waiver "was the result of free and deliberate

20  choice" with "the cognitive capacity to understand and waive" those rights.  *Id.* at 16.  The

21  Magistrate Judge recommended that Goldstein's pre-*Miranda* statements be suppressed and all

22  others made before Goldstein's invocation of the right to counsel be admitted.  *Id.*

23      Except for a few scant paragraphs, Goldstein's objection, Doc. 145, is a verbatim refiling of

24  the Supplement to his Pro Per Motion to Suppress, Doc. 123, and the very same text is regurgitated

25  verbatim yet again in Goldstein's reply in support of that objection.  Doc. 153.  By the few new

26

passages in these documents, Goldstein objects to the Report and Recommendation by claiming that Officer Dong's testimony about the Mirandizing of Goldstein was "suspect at best, and is really better characterized as entirely implausible," Doc. 145 at 12, that "the Magistrate Judge failed to give proper weight to Goldstein's mental and emotional impairments when assessing the voluntariness of his statement" and his *Miranda* waiver, *id*. at 2, and that the Magistrate Judge erred by not addressing Goldstein's *Rochin* argument because the police conduct here "shocks the conscience." *Id*. at 14.

This Court has conducted a de novo review of the record in this case in accordance with 28 U.S.C. § 636 (b)(1)(C), Federal Rule of Criminal Procedure 59(b)(3), and Local Rule 3-2, including but not limited to a careful review of the transcript of the October 16, 2012, hearing and thorough consideration of all exhibits admitted therein.  The Court determines that Judge Leen's recommendation will be ACCEPTED.  Defendant Goldstein's Motion to Suppress will therefore be GRANTED in part and DENIED in part as set forth below.

**I.**

**Discussion**

**A.    Goldstein's Pre-*Miranda* Statements**

The Fifth Amendment recognizes a defendant's right not to "be compelled in any criminal case to be a witness against himself."  U.S. Const. amend V.  "The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Miranda*, 384 U.S. at 444.  Those procedural safeguards are commonly known as *Miranda* warnings, which are required when a defendant is subjected to custodial interrogation.  *Allen v. Roe*, 305 F.3d 1046, 1050 (9th Cir. 2002).

The parties to this case do not dispute that Goldstein was in custody from the moment he was removed from the vehicle.  The government also established that Goldstein was Mirandized within

several minutes of being removed from the vehicle.  Doc. 150 at 12–15, 43–45.  The first Fifth

Amendment issue concerns the nature and admissibility of Goldstein's pre-*Miranda* statements.  The

Magistrate Judge found that all of Goldstein's statements to Officer Dong prior to *Miranda* warnings

should be suppressed because "the testimony glossed over which of Goldstein's statements were

spontaneous and which were in response to explicit questions."  Doc. 138.  Upon de novo review of

the testimony, the Court agrees.

### 1.  *Possibly spontaneous statements*

*Miranda*'s safeguards are triggered "whenever a person in custody is subjected to either

express questioning or its functional equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Voluntary statements made spontaneously and not in response to custodial interrogation are not

subject to suppression under *Miranda*.  *Id*.  Officer Dong testified that, when he removed Goldstein

from the vehicle, Goldstein "was basically screaming that he was sorry, and he did a stupid thing,

and he wanted [the officer] to call his wife."  Doc. 150 at 11:4–8.  Spontaneous, uncoerced

statements may be exempted from exclusion because they are not the product of custodial

interrogation.  *See United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir. 1985) (writing that

"[t]he procedural protections afforded by *Miranda* . . . are designed to secure an accused's privilege

against self-incrimination and are triggered only in the event of a custodial interrogation.").

However, the government has not met its burden of demonstrating that these statements were not

made in response to direct questions, as Officer Dong also testified that he asked a number of general

questions of Goldstein before he was Mirandized.  *See* Doc. 150 at 55.  Thus, whether these

statements were spontaneous was not sufficiently established to permit their admission at trial.

### 2.  *Questions about the whereabouts of the gun*

"Under the public safety exception, *Miranda* warnings need not be given when 'police

officers ask questions reasonably prompted by a concern for the public safety.'"  *Allen*, 305 F.3d at

1050 (quoting *New York v. Quarles*, 467 U.S. 649, 656 (1984)).   "This exception applies to

1    exigencies involving the safety of both the public at large and the officers on the scene." *United*

2    *States v. DeSantis*, 870 F.2d 536, 539 (9th Cir. 1989) (citing *New York v. Quarles*, 467 U.S. 649,

3    658–59 (1984)).  For the public safety exception to apply, there must have been "an objectively

4    reasonable need to protect the police or the public from immediate danger." *United States v.*

5    *Carrillo*, 16 F.3d 1046, 1049 (9th Cir.1994) (citations omitted) (internal quotation marks omitted).

6    "That is, the police must reasonably believe that there is a serious likelihood of harm to the public or

7    fellow officers."  *Allen*, 305 F.3d at 1050.

8           Officer Dong testified that he "observed a—holster—soft-shelled holster on the ground" and

9    "asked the subject where the gun was, fearing for [the Officer's own] safety and the safety of others.

10    [Goldstein] said the gun was in a safe place." Doc. 150 at 11:10–14.   The government neither

11    sufficiently distinguished this portion of the pre-*Miranda* questions from the rest of the custodial

12    interrogation nor demonstrated that such questions were prompted by the officer's safety concerns

13    and that those concerns were reasonable, particularly considering that Goldstein had been removed

14    from the vehicle and handcuffed.  *See* Doc. 150 at 10, 55.  The government, therefore, did not show

15    that any pre-*Miranda* statements should come in under the public safety exception.  Accordingly, the

16    Court agrees with the Magistrate Judge that any statement Goldstein made before he was read his

17    *Miranda* rights should be suppressed.

18    **B.**      **Goldstein's Post-*Miranda* Statements**

19           Before a court may introduce statements made by a suspect in custody and under

20    interrogation, the government has the burden of proving, by a preponderance of the evidence, that the

21    defendant has voluntarily, knowingly, and intelligently waived his *Miranda* rights. *See Colorado v.*

22    *Spring,* 479 U.S. 564, 573 (1987); *Colorado v. Connelly,* 479 U.S. 157, 168 (1986).  The

23    government satisfies its burden if it makes two prerequisite showings.  First, the relinquishment of

24    the right must have been voluntary in the sense that it was the product of "a free and deliberate

25    choice rather than coercion or improper inducement." *United States v. Shi*, 525 F.3d 709, 728 (9th

26

1   Cir. 2008) (quoting *United States v. Doe,* 155 F.3d 1070, 1074 (9th Cir. 1998)).  Second, the waiver

2   must have been made "knowingly" and "intelligently."  Only if the "totality of the circumstances

3   surrounding the interrogation" reveal both an uncoerced choice and the requisite level of

4   comprehension may a court properly conclude that the *Miranda* rights have been waived.  *Moran v.*

5   *Burbine,* 475 U.S. 412, 421 (1986) (citation omitted).  Goldstein contends that his post-*Miranda*

6   statements are inadmissible because the evidence that Goldstein "was read a proper *Miranda*

7   warning" was "suspect at best, and is really better characterized as entirely implausible."  Doc. 145

8   at 12.  He also argues that his mental, emotional, and physical condition and the "chaotic" nature of

9   the scene prevented his waiver from being knowing and voluntary.  *Id.* at 12–13.  This Court finds

10  that the government proved by a preponderance of the evidence that the totality of the circumstances

11  demonstrates that Goldstein's *Miranda* waiver and his post-*Miranda* statements were made

12  voluntarily, knowingly, and intelligently.

13          ***1.      The reading of <u>Miranda</u> rights***

14          Goldstein's claim that the evidence that he was read a proper *Miranda* warning is "suspect at

15  best" and "really better characterized as entirely implausible" is unsupportable.  The only evidence in

16  the record about the Mirandizing of Goldstein is Officer Dong's unrefuted testimony that Officer

17  Baldassare read Goldstein the warning straight from the standard, Metro Academy-issued card that

18  stated:

19                  1. You have the right to remain silent.  2. Anything you say can be
                    used against you in a court of law.  3. You have the right to the
20                  presence of an attorney.  4. If you cannot afford an attorney, one will
                    be appointed before questioning.  5. Do you understand these rights?
21

22  Doc. 150 at 12–14.  Officer Dong testified that he saw Officer Baldassare read those rights directly

23  from the card as he was "actually in front of Officer Baldassare with Mr. Goldstein" while

24  Baldassare was reading the card and that he was "absolutely sure" that the card read to Goldstein

25  "was identical to the one" read in court.  *Id.* at 43–45.  And he testified that Goldstein responded

26

with a simple "yes" at the end of the "Do you understand these rights?" question.  *Id*. at 15, 45.  The record is clear in this regard, and, with this testimony, the government has satisfied its burden of demonstrating that a proper *Miranda* warning was provided.  *See Miranda*, 384 U.S. at 479 (requiring that "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."); *United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997) (noting that, "to solicit a waiver of *Miranda* rights, a police officer need neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights," and finding waiver where there was a recitation of rights "accompanied by the officer's confirming that" the suspect "understood his rights").

### 2.   The <u>Miranda</u> waiver

Goldstein contends that the Magistrate Judge "failed to give proper weight to Mr. Goldstein's mental and emotional impairments when assessing the voluntariness of his statement[s], his ability to knowingly and voluntarily waive his rights under Miranda, and in assessing the impact of the police's improper and coercive tactics upon Mr. Goldstein."  Doc. 145 at 2–3.  He contends that "Mr. Goldstein was borderline insane and suffering from a deep depression and suicidal ideation," and was "suffering severe withdrawal from pain medication" and was "in extreme back pain from the broken back that caused his addiction originally.  He had just been in two car crashes, the last of which was so severe that it disabled the vehicle."  Doc. 145 at 12.  And he claims "the scene of the arrest was chaotic" with police, sirens, and emergency equipment.  *Id*. at 13.  The record does not support the conclusion that Goldstein's mental and emotional state or chaos at the arrest scene prevented him from providing a voluntary, knowing, and intelligent waiver.

1            ***a.***     ***Goldstein's mental and emotional state***

2         Goldstein did not testify at the suppression hearing or call any witnesses to testify.  However,

3 in oral argument at the hearing, counsel for Goldstein urged the court to consider the Forensic

4 Psychiatric Evaluation Report of Dr. Kahmein A. LaRusch, M.D, Doc. 123-1, which is attached as

5 an exhibit to the Supplemental Motion to Suppress.  *See* Doc. 150 at 83.  And it is upon this report

6 that Goldstein relies in claiming he was too mentally and emotionally impaired to make a voluntary,

7 knowing, or intelligent waiver.

8         Dr. LaRusch did not examine Goldstein at or near the date of his arrest.  He performed a four

9 hour and forty minute mental status examination of Goldstein eighteen months after the arrest, and

10 his conclusions about Goldstein's mental and emotional state are based almost exclusively on

11 Goldstein's own dramatic narrative that Dr. LaRusch reports began:

12                     I've got a lot to tell you . . . .  I was suicidal the day of the offense.  I
                    didn't care if I got shot or killed . . . .  It was a 3-way collision of my
13                     life collapsing on me with a 40 year prescription drug habit, a lack of
                    money and two businesses failing . . . .

14

15 Doc. 123-1 at 4, 11.  Dr. LaRusch administered a number of tests and—consistent with Goldstein's

16 own inexpert self-diagnosis—Dr LaRusch opines that Goldstein suffered a temporary mental

17 collapse under stress on the date of the incidents which left Goldstein's "usual, logical, rational self

18 paralyzed."  Doc. 123-1 at 13.

19         However, he also opines that Goldstein was not "quite sick enough to be diagnostically

20 labeled as psychotic or delusional at the time of the incident."  *Id.*  Rather, Goldstein "wasn't

21 thinking as he normally would have, but, like a psychotic or delusional person, he behaved

22 irresponsibly and irrationally."  *Id.*  Dr. LaRusch concludes that Goldstein was not delusional and

23 "would have been able to pass a reality orientation test the date of the incident."  *Id.* at 14.  Goldstein

24 did not meet the diagnostic criteria for brief psychotic disorder under DSM-IV-TR; he was not

25 hallucinating; he did not have disorganized speech; and he did not have grossly disorganized, bizarre

26

or catatonic behavior.  *Id.*  And although Dr. LaRusch concludes that Goldstein was "in a state of borderline insanity," he qualifies that highly charged statement by explaining, "It should be noted that many decades ago the word 'insane' fell out of use in psychiatry, and is not even mentioned in the DSM-IV-TR.  Nevertheless I think it is a useful term to describe [Goldstein's] state that day."  *Id.* at 14.  He uses the term "insane" not as a scientific term but rather based on "the standard denotative definition in the lexicon of standard English language which states insanity is: 'abnormal mental or abnormal behavioral patterns.'"  *Id.*  Dr. LaRusch bases his "borderline insane" conclusion, in part, on Goldstein's recounting that he thought he was 59 at the time of his arrest when actually he was 60.  *Id.* at 14 (writing that "[h]is addiction was so severe it made him lose track of his own age").  But the recorded ambulance conversation with Officer Dong reflects that Goldstein accurately reported his age as 60.  Ex. 1 at 2.  Nothing in Dr. LaRusch's report suggests that Goldstein was pressured or otherwise coerced by law enforcement officers at any time.

"The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion."  *Connelly*, 479 U.S. at 170 (citing *United States v. Washington*, 431 U.S. 181, 187 (1977)).  "A defendant's mental condition, by itself and apart from its relation to official coercion" is not dispositive "of the inquiry into constitutional voluntariness."  *Id.* at 164 (citing *Spano v. New York*, 369 U.S. 315 (1959) (internal quotation marks omitted); *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973) (writing that courts examine "both the characteristics of the accused and the details of the interrogation" when inquiring into voluntariness)).  In the absence of coercion, mental and emotional instability do not render a coherent and alert detainee's *Miranda* waiver and voluntary statements to law enforcement officers inadmissible.  *See, e.g.*, *United States v. Marquez-Lerma*, 203 Fed. Appx. 1 (9th Cir. 2006) (affirming denial of motion to suppress statements on claim that defendant's depressed emotional state prevented him from making a knowing and intelligent waiver of his rights where officers "testified that defendant was 'coherent' and 'reasonable' and that they had no reason to suspect that

1  his Miranda waiver was not knowing and intelligent."); *United States v. Ritter*, 456 F.2d 178, 179

2  (10th Cir. 1972) (denying motion to suppress and reasoning that defendant's "claims of instability,

3  employment difficulties, psychiatric treatment, fear of policemen and being tired and hungry will not

4  serve to overcome confessions given after proper *Miranda* warnings with no evidence of force,

5  threats or promises being used to obtain the confessions."); *Commonwealth v. Zagrodny*, 819 N.E.2d

6  565, 572 (Mass. 2004) (rejecting mentally ill defendant's voluntariness challenge of inculpatory

7  statements made to the police because "when the defendant spoke to the police, both at his mother's

8  home and at the police station, there was evidence that he was 'calm' and 'alert,' and his confessions

9  were chronological and 'coherent.'").  "Coercive police activity is a necessary predicate to the

10  finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the

11  Fourteenth Amendment."  *Connelly*, 479 U.S. at 167.

12      Goldstein appears—based on the testimonies of Officer Dong and paramedic Pettengill and

13  based on the transcript and recording of this ambulance conversation with Officer Dong—to have

14  been fully conscious and able to speak, capable of linear thought and able to provide direct responses

15  to questions.  He neither seemed confused nor appeared to lack an understanding of his situation or

16  the questions posed to him, and the audio recording and transcript of that conversation do not

17  suggest otherwise.  *See, e.g.*, Doc. 150 at 48–49, 62–63; Ex. 1; Ex. 2.  With no evidence of police

18  coercion, and as Goldstein was apparently alert and coherent and his statements were coherent,

19  Goldstein's mental and emotional state do not undermine the voluntariness of his post-*Miranda*

20  statements to the police.  Even if Goldstein were suffering symptoms of withdrawal from his pain

21  medications (which the record does not sufficiently support), custodial confessions are not rendered

22  involuntary simply because the defendant was on or withdrawing from drugs.  *See, e.g.*, *United*

23  *States v. Kelly*, 953 F.2d 562, 566 (9th Cir. 1968) (citing *Gladden v. Unsworth*, 396 F.2d 373,

24  380–81 (9th Cir. 1968)) (finding confession voluntary despite defendant suffering heroin withdrawal,

25  shaking and trembling, and telling agents they needed to hurry if they wanted to continue the

26

11

interrogation); *United States v. Heller*, 551 F.3d 1108 (9th Cir. 2009) (finding confession voluntary despite defendant ingesting Tylenol III before arriving at the police station); *United States v. Rodriguez-Rodriguez*, 364 F.3d 1142, 1146 (9th Cir. 2004), *amended on other grounds by* 393 F.3d 849 (9th Cir. 2005) (holding confession voluntary despite defendant's heroin withdrawal because defendant was alert, coherent, and oriented); *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000) (finding confession voluntary despite defendant's heroin withdrawal and despite defendant's claim that agents promised him leniency in return for cooperation); *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (concluding that confession was voluntary because defendant's intoxication did not overcome his free will where defendant was able to drive, could obey officers' instructions, and was cooperative in talking with them); *United States v. Martin*, 781 F.2d 671, 674 (9th Cir. 1985) (holding that type, dosage, and schedule of painkilling narcotic administered to defendant was insufficient to overbear defendant's will to resist questioning or impair his rational faculties). Similarly, the record fails to support the conclusion that the arrest scene or ambulance ride were "chaotic" or that the conditions of those scenes constitutionally compromised Goldstein's *Miranda* waiver or any of his statements to Officer Dong so as to strip them of their voluntary, knowing, and intelligent quality.

### b.    *Goldstein's physical injuries*

The fact that Goldstein was physically injured at the time he provided his *Miranda* waiver and inculpatory statements also does not render these statements inadmissible.  Statements made in an ambulance, after an injured suspect is advised of his *Miranda* rights, are not necessarily inadmissible.  As the Missouri Court of Appeals observed in affirming the denial of a motion to suppress inculpatory statements where "(a) defendant had been shot, (b) he was alone surrounded by officers, (c) one officer had his weapon drawn, (d) his left hand was wrapped in a towel, (e) his left thumb was almost severed, (f) a police dog was somewhere nearby," "[w]e know of no constitutional prohibition against a seriously wounded person making a statement."  *State v. Ambus*, 522 S.W.2d

1   306, 311 (Mo. Ct. App. 1975).  The *Ambus* court rejected the defendant's claims that he was in such

2   pain and under such mental and psychological pressure that he "could not make an intelligent waiver

3   of his right to remain silent," reasoning that the suspect "was lucid, he was able to converse enroute

4   to the hospital with the officer who accompanied him."  *Id.  See also United States ex rel. Cronan v.*

5   *Mancusi*, 444 F.2d 51, 54 (2d Cir. 1971) (rejecting theory that "a serious gunshot wound must be

6   presumed to render its victim incapable of exercising free volition and making rational choices" and

7   affirming district court's denial of motion to suppress defendant's confession where officers testified

8   that defendant was "'wide awake' and appeared to '(know) what was going on.'"); *Reinert v. Larkin*,

9   211 F. Supp. 2d 589 600–02 (E.D. Pa. 2002) (finding no coercion where stabbed defendant was

10  Mirandized, paramedic found defendant to be mentally oriented, and defendant made inculpatory

11  statements to police during ambulance ride); *State v. Hampton*, 509 S.W.2d 139, 143 (Mo. Ct. App.

12  1974) (writing that "[c]ontrary to defendant's claim, the fact that he was in the hospital awaiting

13  treatment when he made the incriminating statements does not preclude the finding that his waiver

14  was voluntary where there is no evidence that his physical condition in any way inhibited his

15  understanding of the *Miranda* rights.").

16       Goldstein relies on *Mincey v. Arizona* and *Jackson v. Denno*, 378 U.S. 368 (1964), in support

17  of his argument that his post-*Miranda* conversations with Officer Dong are inadmissible.  In *Mincey*,

18  the suspect was undergoing treatment for a gunshot wound sustained several hours earlier.  *Mincey*,

19  437 U.S. at 398.  When Mincey arrived at the hospital, the attending physician found him "depressed

20  almost to the point of coma."  *Id.* (internal quotation marks omitted).  Yet the police questions

21  flowed.  Mincey was "evidently confused," "unable to think clearly," and "at the complete mercy" of

22  the detective while receiving treatment in the intensive care unit.  *Id.* at 398–99, 401.  The detective

23  flatly ignored his requests for an attorney.  *Id.* at 399.  Further, "despite Mincey's entreaties to be let

24  alone, Hust ceased the interrogation only during intervals when Mincey lost consciousness or

25  received medical treatment, and after each such interruption returned relentlessly to his task."  *Id.* at

26

13

1   401.  The Supreme Court found that Mincey's statements "were not the product of his free and

2   rational choice."  *Id.* (quoting *Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968)) (internal quotation

3   marks omitted).  Mincey made it clear that he "wanted *not* to answer."  *Id.* (emphasis in original).

4         In *Jackson*, the defendant claimed that he was in pain from gunshot wounds, gasping for

5   breath, and unable to speak long; that police denied him water and said he would not be left alone

6   until he furnished the answers they sought; and that hospital-administered drugs affected his will.

7   *Jackson*, 378 U.S. at 389.  The state offered evidence that the defendant was "strong" despite his

8   wounds, denied making verbal threats, and put on evidence that the drugs could not and did not

9   affect his will.  *Id.*  These "substantial facts in dispute" led the Court to conclude that New York's

10  state court procedure, which allowed the confession to be introduced without a predetermination of

11  voluntariness, required the Court to remand for the state court to determine whether the confession

12  was rendered inadmissible by coercion.  *Id.* at 391–92.

13        The instant case lacks the coercive benchmarks that guided the Court in *Mincey* and *Jackson*

14  and which are "necessary predicate[s]" to a finding that the *Miranda* waiver or inculpatory

15  statements were not voluntary, intelligent, and knowing.  *See Connelly*, 479 U.S. at 167.  Although

16  Goldstein was likewise receiving medical attention for a gunshot wound when police interrogated

17  him, that is where the similarities between these cases end.  Whereas Mincey and Jackson were

18  apparently in extreme physical distress—they had trouble breathing, while drifting in and out of

19  consciousness—the paramedic's physical and mental examination of Goldstein concluded that

20  Goldstein "was coherent [and] knew what was going on," and while "altered from his injuries,"

21  Goldstein appeared "alert" and "coherent" the entire time.  *Id.* at 62–63, 68.  He actively and

22  coherently participated in a back-and-forth, lucid, and linear conversation with Officer Dong for

23  approximately six minutes during the ambulance ride.  Ex. 1; Ex. 2.  He received the highest

24  score—15/15—on the Glasgow Coma Scale test for eye opening, motor response, and verbal

25  responsiveness and orientation.  *Id.* at 64–65.  He also received normal results for three separate sets

26

14

of vital signs. *Id.* at 66.  Goldstein's heart rate, the amount of oxygen in his blood, and his blood

sugar were all normal. *Id.* at 65–66.  Goldstein never told the paramedic that he was in pain or

needed medication. *Id.* at 66–67.  Indeed, Goldstein expressed complete disbelief that he had been

shot and was unaware that he was bleeding until Officer Dong ultimately convinced him of that

reality. *See* Doc. 150 at 41.  Like the wounded defendants in *Ambus*, *Cronan*, *Reinert*, and *Hampton*,

Goldstein has not demonstrated that his physical condition in any way inhibited his understanding of

the *Miranda* rights or prevented him from making voluntary, knowing, and intelligent statements.

Further, Goldstein does not contend that police threatened him or continued to ask him

questions despite entreaties to stop, and the record contains no indicators of coercion, compulsion, or

overreaching by the officers.  Unlike the detective in *Mincey* who flatly ignored the defendant's pleas

for an attorney, Officer Dong stopped his questioning immediately upon Goldstein's request for

counsel.  Doc. 150 at 20, 52; Ex. 1 at 8.

In sum, upon careful, de novo review of the full record, the Court agrees with the Magistrate

Judge's conclusion that the government demonstrated by a preponderance of the evidence that, under

the totality of the circumstances, Goldstein's post-*Miranda* statements to Officer Dong at the scene

and in the ambulance en route to the hospital were voluntary, knowing, and intelligent, and

Goldstein's motion to suppress these statements should be denied.

**C.    Statements made in the hospital**

Following Goldstein's admission to the hospital, LVMPD Detective Arajuno recorded

Goldstein's statement that "he was sorry but he need the money."  This occurred after Goldstein

invoked his right to attorney. *See Edwards*, 451 U.S. at 484–85.  The government states that it will

not use this statement at trial, mooting this issue for the Court at this time.  Doc. 128 at 7.

**D.    The *Rochin* claim**

Finally, the Defendant's statements have not been rendered inadmissible based upon

conscience-shocking governmental conduct as contemplated by *Rochin*.  In *Rochin* and its progeny,

1    the Court recognized that evidence obtained through governmental conduct "so brutal and so

2    offensive to human dignity" that it shocks the conscience violates Due Process and must be

3    excluded.  *Rochin*, 342 U.S. at 172, 174; *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).  But the

4    Supreme Court has held a custodial interrogation of a gunshot victim not conscience shocking on

5    facts more compelling than those offered by Goldstein.  In *Chavez v. Martinez*, Martinez was shot

6    several times during an altercation with police officers, "causing severe injuries that left Martinez

7    permanently blinded and paralyzed from the waist down."  *Chavez v. Martinez*, 538 U.S. 760, 764

8    (2003).  Officer Chavez rode with him to the hospital "and then questioned Martinez there while he

9    was receiving treatment from medical personnel."  *Id.*  Martinez admitted to taking a gun from the

10   officer's holder and pointing it at police, and that he was a heroin user.  *Id.*  At one point, he said, "I

11   am not telling you anything until they treat me."  *Id.*  Yet Chavez continued interviewing him

12   without *Miranda* warnings.  *Id.*

13        The United States Supreme Court did not find Chavez's behavior to be egregious or

14   conscience shocking, reasoning, "[h]ere there is no evidence that Chavez acted with a purpose to

15   harm Martinez by intentionally interfering with his medical treatment.  Medical personnel were able

16   to treat Martinez throughout the interview, and Chavez ceased his questioning to allow tests and

17   other procedures to be performed.  Nor is there evidence that Chavez's conduct exacerbated

18   Martinez's injuries or prolonged his stay in the hospital."  *Id.* at 774.[1]

19        Similarly, Officer Dong's post-*Miranda* questioning of Defendant Goldstein does not rise to

20   the conscience-shocking level.  Officer Dong and attending paramedic Robert Pettingill both testified

21   that Goldstein was alert, coherent, and "knew what was going on."  Doc. 150 at 17:17–24, 23:11–16,

22   63:1–5, 63:18–23, 68:6–19.  He was ambulatory and received the highest score available on his vital

23   sign test.  *Id.* at 64:5–65:11, 67:24–68:9.  And at no point did Mr. Goldstein "articulate to [the

24

25        [1] The Court remanded to the Ninth Circuit the question of whether Martinez could nevertheless
     pursue a substantive due process claim.  *Id.* at 2008.

26

1    paramedic] that he was in pain," nor did the paramedic "perceive that [Goldstein] was in pain to a

2    point where [the paramedic] thought he needed some sort of medication." *Id*. at 66:21–24, 67:3-6.

3    Officer Dong's questioning did not interfere with the emergency medical care providers' work or

4    ability to start an IV, take Goldstein's blood pressure, monitor his heart rate, and stabilize him for

5    transport. *Id.* at 18:1–5, 52:3–5.  Indeed, it appears that the medical treatment that Mr. Goldstein

6    received was primarily limited to "just monitoring" and documenting his vital signs. *Id.* at

7    50:16–51:24.  The recorded ambulance-ride conversation supports these conclusions.  Ex. 1; Ex. 2.

8         In sum, these circumstances do not demonstrate the type of "methods too close to the rack

9    and the screw" denounced in *Rochin* and its progeny.  *Rochin*, 342 U.S. at 172 (concluding that

10   "[i]llegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove

11   what was there, [and] the forcible extraction of his stomach's contents"–all in an effort to obtain

12   evidence—was "conduct that shocks the conscience"); *see also Sanders v. Jackson Twp. Police*

13   *Dep't*, 2011 WL 3438867, at *5 (D.N.J. Aug. 4, 2011) (rejecting *Rochin* argument where detainee

14   was questioned at hospital while suffering head trauma, lacerations, fractures to his wrist and arm,

15   and other injuries, and he claimed that he was held by detectives in a private room for an hour and

16   twenty-five minutes without receiving medical treatment and despite telling the detectives he was in

17   pain).

18                                            **II.**

19                                      **Conclusion**

20        Accordingly, and with good cause appearing and for the reasons set forth above, the Court

21   **AFFIRMS** Magistrate Judge Leen's Report and Recommendation **[Doc. 138]**; and

22   . . .

23   . . .

24   . . .

25

26
                                               17

IT IS HEREBY ORDERED that Defendant's Motion to Suppress Statements Obtained in Violation of the Fifth Amendment **[Doc. 123]** is **GRANTED IN PART AND DENIED IN PART** as stated herein.

Dated September 25, 2013.

_____
Jennifer A. Dorsey
United States District Judge

18